IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 6:17-cr-00238-AA |
| | **OPINION & ORDER** |
| Plaintiff, | |
| vs. | |
| FRANK DEFELICE, | |
| Defendant. | |

AIKEN, District Judge:

Defendant Frank DeFelice moves to suppress evidence obtained by law enforcement during a search of his fifth-wheel trailer and any statements made to a detective at the Marion County Jail on September 13, 2016. The Court held a suppression hearing on November 14, 2018. For the reasons that follow, defendant's Motion to Suppress (doc. 41) is DENIED.

# FINDINGS OF FACT

In 2016, the Albany Police Department Street Crimes Unit began to investigate methamphetamine delivery in the Albany area. They identified Sasha Davidson as a person who was dealing methamphetamine in Albany. Both confidential and named sources, including Davidson, identified defendant as her supplier. Through further investigation, police obtained the address of defendant's residence: 6094 Silverton Road NE in Salem.

In April 2016, police stopped Davidson in Albany in a Gold Cadillac Escalade that was registered to defendant and arrested her for driving while suspended.

In August 2016, police stopped Davidson in another car that she identified as belonging to defendant. During the stop, police recovered methamphetamine. Davidson told the police that she was returning from defendant's house and provided them with his phone number. Police obtained a court order to monitor both Davidson's and defendant's phones.

The phone monitoring revealed two significant locations in Salem: defendant's residence at the Silverton Road address and a space in a campground and trailer park located at 3700 Hager's Grove Road SE. Police observed the following sequence of phone pings: When Davidson would leave Albany and travel to the Silverton Road address, defendant would leave the Hager's Grove Road address and travel to the Silverton Road address. Then, Davidson would head back south to Albany.

On September 12, 2016, defendant's phone pinged at his house and then in the area of the campground and then back at his house. That evening, police observed

Davidson leave defendant's house. They stopped her car and recovered methamphetamine and a firearm.

Just after midnight on September 13, 2016, police executed a search warrant at defendant's house and detained defendant and two other occupants. At approximately 12:50 AM, Albany Police Detective Curtis Bell took custody of defendant and advised him of his *Miranda* rights. When Detective Bell asked defendant if he understood his rights and had any questions, defendant answered that he understood his rights and had no questions.

Detective Bell then placed defendant in the back of his patrol vehicle and drove him to a nearby property owned by Marion County Public Works. There, Detective Bell read the search warrant to defendant and two others who had been detained at the house and had been driven to the Marion County Public Works Property by other officers. Detective Bell advised all three of their *Miranda* rights and asked if they understood or had any questions. They all responded that they understood their rights and did not have any questions.

Detective Bell then separated the parties, turned on a voice recorder and told defendant that their conversation was being recorded. He reminded defendant that he had read the search warrant and asked whether defendant had any questions. Defendant responded, "No." He also asked defendant to confirm that he had been advised of his *Miranda* rights, which defendant did, and asked if defendant had any questions about those rights. Again, defendant said that he did not have any question. The interrogation continued until 1:00 AM, when defendant refused to

answer one of Detective Bell's questions and stated that he would not answer any further questions until he spoke with his lawyer. Bell turned off the recorder and ended the interrogation. Defendant and Bell then had an unrecorded conversation about defendant cooperating with Bell and engaging in a controlled buy. Defendant declined to cooperate in this way.

Once Detective Bell was advised that the house was safe, he returned to the house with defendant. Defendant sat in the living room until the search was completed. Detective Bell then drove defendant to the Marion County Jail, where defendant was held on possession and delivery of methamphetamine based on evidence that had been obtained during the search as well as evidence that had been seized from Davidson on September 12, 2016.

Although the items seized during the search provided some evidence of drug dealing, the search did not reveal the significant quantities of narcotics and guns that the detectives had expected to find. That inconsistency led detectives to believe that defendant was storing the contraband elsewhere. So, later in the day on September 13, 2016, Detective Bell reviewed the phone monitoring data and observed defendant's pattern of travelling between his house and the campground on Hager's Grove Road.

Another detective called the campground and learned from the office clerk that defendant rented space F-10 there. Detective Bell visited the campground and obtained copies of defendant's rental contract, which was completed on August 26, 2016. Detective Bell also visited space F-10, where he observed a fifth-wheel trailer

and defendant's gold Cadillac Escalade, which Davidson had been driving back in April.

After visiting the campground, Detective Bell returned to the Marion County Jail around 4:00 pm. He arranged for jail deputies to move defendant to a table and chairs placed at the top of a stairwell outside of a room for inmates to speak with visitors. According to defendant, when the deputies went to his cell to move him, defendant told them that he did not want to speak to Detective Bell, and that he wanted to speak to his attorney. The deputies responded that defendant could take that up with Detective Bell.

When defendant arrived at the table, Detective Bell reintroduced himself, reminded defendant that he had previously been read his *Miranda* rights, and acknowledged that defendant had invoked his right to counsel. Accordingly, Detective Bell stated that he would not ask questions about the investigation. Defendant acknowledged that he had been read his *Miranda* rights. Detective Bell then sought to obtain defendant's consent to search the campground site. During the conversation, several jail deputies walked through the area, but there were no other witnesses. Defendant was not handcuffed and ate his dinner during the interview. Ultimately, defendant signed a consent to search form and released the key to his trailer to Detective Bell. The entire interaction lasted about seventy-five minutes. Detective Bell did not bring a voice recorder to the jail and did not record the conversation.

During the conversation, Detective Bell told defendant about the discovery of

the trailer and vehicle at the campground, that he had probable cause to believe that defendant was operating a stash house in the trailer, based on the phone monitoring data, the lease agreement and other evidence that Bell had obtained during his investigation at the campground, the Cadillac's association with Davidson, and information from a confidential informant that defendant had been "ripped off" at least twice and would have an interest in protecting his money and drugs from future theft.

Detective Bell gave defendant a consent to search form and asked him to consent to the search of the trailer and Cadillac at space F-10. Detective Bell told defendant that if he signed the consent to search form, Bell would submit the findings to the District Attorney's office to be favorably considered. Bell told defendant that if he did not sign the Consent to Search Form, the police would apply for a search warrant, search the property, and would charge him based on whatever evidence they found.

Detective Bell read the consent form aloud and filled in the description of the place to be searched while he was sitting with defendant. The form states, in part: "I have been fully informed of my right not to have a search made of my person, property or premises without a search warrant being first obtained and of my right to refuse consent to any search of my person, property or premises." The description section on the form contains the following notation:

> 3700 Hagers Grove Rd SE [Spc F-10] Salem, Marion County, OR, to open
> closed containers searching for evidence of drug crimes
> Gold Cadillac Escalade OR plates

The words "Spc F-10" are written above the rest of the text between "SE" and "Salem."

The government and defendant dispute whether Detective Bell added the space number to the consent form before or after defendant signed it. According to Detective Bell, he realized the space number was missing from the description and added it to the form while he was sitting with defendant and before defendant had signed the form. Detective Bell then asked defendant if he had the trailer key, and defendant responded that it was in his property at the jail. A deputy escorted them both to the property room, where defendant the completed a property release form, removed the trailer key from a key ring containing multiple keys, and gave the trailer key to Bell. Defendant was then returned to his cell.

According to defendant, when he signed the form, "Spc F-10" was not written in the form's description section. Detective Bell did not mention the trailer until the very end of their conversation when he told defendant that, if police found evidence in the Cadillac, they would have probable cause to search the trailer. Defendant testified that Detective Bell told him that, if he did not want the trailer to be damaged during that search, Detective Bell would need the trailer key.

The Court finds Detective Bell's testimony about when he wrote the space number on the form and when he discussed the trailer with defendant to be credible.

During the conversation defendant repeatedly asked Detective Bell questions about what was going to happen to him and if Detective Bell could help him. Detective Bell testified that, each time defendant asked these questions, Detective Bell tried redirecting him to the consent form. In response to defendant's questions,

Detective Bell stated that defendant had been cooperative and that he believed he had valuable information, but that he did not have to authority to decide whether defendant could be a cooperating witness.

Detective Bell also testified that defendant told Bell that he would consent to appear cooperative. Defendant testified that he signed the consent form because he was uncomfortable talking with Detective Bell in a public area in the jail where other inmates could see him, and that he felt that the interview would not end until he gave consent.

After receiving defendant's consent and keys, police searched the car and trailer and seized evidence including over $100,000 in cash, firearms, ammunition, narcotics, scales, and packing materials from the trailer. As a result, defendant was charged with one count of Possession of Methamphetamine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii); one count of Felon in Possession of Firearm(s) in violation of 18 U.S.C. § 922(g)(1); and one count of Possession of a Firearm During and in Relation to a Crime of Violence or Drug Trafficking Crime in violation of 18 U.S.C. § 925(c)(1).

## CONCLUSIONS OF LAW

### I. *Custodial Interrogation*

Defendant argues that during their conversation in the jail Detective Bell interrogated him after he had invoked his right to counsel, in violation of the rules announced in *Miranda v. Arizona* and *Edwards v. Arizona*.[1] Defendant asserts that,

---

[1] Defendant also argues that the jailhouse conversation also violated his Sixth Amendment right to counsel. The Six Amendment right to counsel attaches after "a prosecution is commenced."

because of these *Miranda* and *Edwards* violations, any statements that he made during the conversation and all of the evidence found at the trailer should be suppressed.

In *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), the Supreme Court mandated that specific warnings, including the right to remain silent and the right to the presence of an attorney, must be given before a suspect in custody is interrogated. If *Miranda* warnings are not given, then statements made by the suspect during custodial interrogation may not be used against the suspect in the prosecution's case-in-chief. *Id.* In *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the Supreme Court held that, even after proper *Miranda* warnings have been given, once a suspect in custody requests assistance of counsel, all interrogation must stop "until counsel has been made available to him" or the suspect initiates further interactions with police. Any incriminating statements obtained in violation of the *Edwards* rule must also be suppressed. *Id.* at 487.

Custodial interrogation occurs whenever a suspect "has been taken into custody or is otherwise deprived of . . . freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Custody has also been defined as either "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted).

---

*Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198 (2008). Because the events at issue here took place before any adversarial judicial criminal proceedings were initiated, the Sixth Amendment does not provide grounds for suppression. *See id.* (for purposes of the right to counsel, a prosecution is commenced at "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment").

Defendant was clearly in custody from the time of his arrest at his house. He invoked his right to counsel during the earlier interrogation at the Marion County Public Works property and did not initiate the jailhouse encounter. He did not waive his *Miranda* rights at any time. Therefore, if defendant was interrogated in the jail, any incriminating statements that he made in response to that interrogation must be suppressed under *Edwards*.

Interrogation is defined as "either express questioning or its functional equivalent[,]" including "words or actions on the part of the police" that the police "should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). An "incriminating response" is "any response – whether inculpatory or exculpatory – that the *prosecution* may seek to introduce at trial." *Id.* at 300 n. 5 (emphasis in original).

Here, defendant identifies the following statements and actions related to defendant's consent to search – the consent to search form, defendant's statement that the key to the trailer was with his property at the jail, and defendant's act of locating the key on his keychain and handing it to Detective Bell.

Detective Bell did not violate *Edwards* by obtaining defendant's consent to search via the consent form. An officer's request to search does not constitute interrogation because "[t]he mere act of consenting to a search . . . does not incriminate a defendant, even though the derivative evidence uncovered may itself be highly incriminating." *United States v. Henley*, 984 F.2d 1040, 1042-43 (9th Cir. 1993). Similarly, "consent to search is not the type of incriminating statement toward

which the Fifth Amendment is directed. It is not in itself 'evidence of a testimonial or communicative nature.'" *United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977) (quoting *Schmerber v. California*, 384 U.S. 757, 761 (1966)).

Additionally, Detective Bell did not violate *Edwards* by asking defendant about and for the key to the trailer. In context, those requests were part of Detective Bell's request for consent to search – with them, he sought to reiterate that he had consent to search the trailer and to facilitate the search without causing damage to the trailer. Defendant argues that the requests were interrogation because his responses were incriminating. He asserts that, by stating that the key was with his other property and by handing the key to Detective Bell, he admitted that he owned or controlled the trailer and, thus, controlled all the contraband ultimately found there. However, Detective Bell already had evidence suggesting defendant owned the trailer, including phone ping data placing defendant at the site on several occasions, the lease agreement for space F-10, and statements from the campground office clerk identifying defendant as the tenant of space F-10. Accordingly, Detective Bell's requests about the key were not interrogation within the meaning of *Miranda* or *Edwards*.

As for any other statements defendant may have made during the his jailhouse conversation with Detective Bell, the Court reserves ruling on their admissibility unless and until the Government indicates that it intends to introduce such statements as evidence.

Finally, because Detective Bell did not violate the rules in *Miranda* or *Edwards*

when he obtained defendant's consent to search, defendant's argument regarding suppression of the physical evidence also fails. But even if the evidence had been found as a result of a *Miranda* or *Edwards* violation, the evidence would not be suppressed unless defendant's consent was "actually coerced," which, as discussed below, the Court concludes it was not. *United States v. Patane*, 542 U.S. 630, 636 (2004).

II.  *Consent to Search*

Defendant argues that the evidence found in the trailer should be suppressed because his consent to search was not voluntary or, alternatively, the search of the trailer exceeded the scope of his consent.

A.  *Voluntary Consent*

Warrantless searches violate the Fourth Amendment unless the government demonstrates that an established and well-defined exception applies. *United States v. Brown*, 563 F.3d 410, 414 (9th Cir. 2009). Consent can provide such an exception, but the government bears the burden of proving that the consent was voluntary by a preponderance of the evidence. *Id.* at 415. The Government's burden "is not satisfied by a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). Voluntariness is a question of fact based on the totality of the circumstances surrounding the giving of consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The Ninth Circuit has instructed courts to consider five factors to determine if consent was voluntary or if it was coerced:

> (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were

given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.

*United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002). This list is not exhaustive and none of the factors are dispositive. *Brown*, 563 F.3d at 415. The ultimate inquiry is whether the consent is "the product of an essentially free and unconstrained choice by its maker" or whether the defendant's "will has been overborne and [the defendant's] capacity for self-determination critically impaired[.]" *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

Considering all of the circumstances surrounding his encounter with Detective Bell at the jail, the Court finds that defendant's consent to search was voluntary.

Defendant contends that the five factors that courts generally look to when determining voluntariness are not a good fit for the circumstances of this case. Instead, defendant asks the Court to apply the standard for determining whether police unconstitutionally prolonged a traffic stop, which the Supreme Court announced in *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). Under that standard, a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete the mission" of the stop. *Id.* at 1614-15. Thus, defendant urges the Court to focus on the duration of the interaction between Detective Bell and defendant and conclude that defendant's consent was not voluntary because Detective Bell prolonged the interaction beyond the time reasonably required to ask defendant for his consent to search.

The Court declines to depart from well-settled precedent. First, as mentioned,

the five voluntariness factors are not exhaustive or exclusive. As such, the court can already consider the length of a police-citizen interaction when determining whether, *under the totality of the circumstances*, consent was voluntary. Moreover, applying the *Rodriguez* standard would elevate one factor, duration, over all others. Second, it is not helpful to import the *Rodriguez* standard to assess the duration of an interaction in the context of voluntariness because of key differences between the two inquiries. *Rodriguez* dealt with traffic stops, which are seizures made without probable cause that are justified by particularized suspicion. *See United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) ("Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." (emphasis in original and quotation marks omitted)). The *Rodriguez* standard is thus used to determine whether officers' actions exceed the narrow scope of the justification for a stop. By contrast, the issue of voluntariness addresses whether an officer even has a valid justification for a search. The voluntariness inquiry, thus, focuses on whether officers' actions had a coercive effect on the person giving consent and ultimately aims to determine whether the person's free will was "overmastered." The mission of the conversation during which consent is obtained and whether the conversation lasted beyond the time to achieve that mission is not particularly relevant in determining how an officer's actions would affect a person. What is more important is whether the length of time, in addition to other circumstances, was so great as to wear a person down and overcome their free will.

Applying the standard voluntariness inquiry, the Court concludes that defendant's consent to search was voluntary under the totality of the circumstances. As mentioned, defendant was undoubtedly in custody while in jail. Although that factor weighs against voluntariness, it also does not render defendant's consent involuntary. Defendant was informed of his *Miranda* rights and demonstrated that he understood them. Similarly, Detective Bell informed defendant that he could refuse consent, the consent form that defendant signed stated that he had a right to refuse consent, and defendant. *See United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980) (knowledge of a right to refuse is "highly relevant" to determining whether consent was voluntary); *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988) ("Execution of a consent form is one factor that indicates that consent was voluntary."). Moreover, although defendant refused consent several times and the conversation continued after each of defendant's refusals, the evidence shows that the duration of the interaction was a result of defendant's choice to extend the conversation by asking Detective Bell questions in an attempt to bargain.

Although Detective Bell's statement that he would apply for a search warrant if defendant did not consent could be interpreted as a claim that Detective Bell could obtain a search warrant, it was followed by Detective Bell's explanation of all of the circumstances that Bell believed supported the existence of probable cause. That context lessens the coercive nature of Bell's statement about obtaining a warrant. *United States v. Meza-Corrales*, 183 F.3d 1116, 1125 (9th Cir. 1999); *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990). Finally, there is no evidence that Detective

Bell made any other threats or promises in an attempt to overmaster defendant. Indeed, Detective Bell was careful to avoid making any promises and repeatedly warned defendant that charging decisions and the benefits of potential cooperation were not within his power. In sum, the totality of the circumstances indicates that defendant consented freely and voluntarily to the search of his car and trailer without coercive external pressure.

### B. *Scope of Consent*

"It is a violation of a suspect's Fourth Amendment rights for a consensual search to exceed the scope of the consent given." *United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006). The standard for measuring the scope of consent is objective reasonableness: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The scope of a search is generally defined by its express object. *Id.*

A reasonable person would have understood that defendant consented to the search of both the Cadillac and the trailer. During their discussion at the Marion County Jail, defendant and Detective Bell discussed the trailer. Detective Bell told defendant that they had learned about the defendant's trailer parked in space F-10 at the campground. As the Court found, the consent form that defendant signed referenced not just the Cadillac, but Space F-10, which reasonably can be understood to encompass both the trailer and Cadillac located there. Finally, when Detective Bell asked if defendant had the keys to the trailer with him in the jail, defendant said yes, and released the keys into Detective Bell's possession. Thus, the search of the

trailer did not exceed the scope of defendant's consent.

Because defendant's consent was voluntary and the search did not exceed the scope of his consent, the evidence found in the trailer need not be suppressed.

## CONCLUSION

For the reasons stated above, defendant's Motion to Suppress (doc. 41) is DENIED.

IT IS SO ORDERED.

Dated this 8th day of April, 2019.

_____
Ann Aiken
United States District Judge